```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
HASSAN NELSON,

                    Petitioner,          MEMORANDUM & ORDER
                                         06-CV-116(JS)
         -against-

WILLIAM BROWN, Superintendent of
Eastern Correctional Facility,

                    Respondent.
----------------------------------------X
Appearances:
For Petitioner:        Andrea G. Hirsch, Esq.
                       111 Broadway, Suite 1305
                       New York, NY 10006

For Respondent:        Kathleen M. Rice, Esq.
                       District Attorney, Nassau County
                       262 Old Country Road
                       Mineola, NY 11501
                       BY:  ADA Judith R. Sternberg, Esq.
                            ADA Margaret E. Mainusch, Esq.
```

SEYBERT, District Judge:

Pursuant to 28 U.S.C. § 2254, Petitioner Hassan Nelson seeks to vacate his state court conviction. Mr. Nelson's original petition raised numerous grounds for relief, and Mr. Nelson has since moved to amend it to include additional grounds. For the foregoing reasons, Mr. Nelson's petition is GRANTED and his conviction is VACATED. Mr. Nelson's motion to amend is also GRANTED.

### BACKGROUND

On January 14, 1999, two individuals entered Thrifty Distributing's ("Thrifty") offices in Hempstead, New York, and perpetrated an armed robbery, escaping with approximately $20 in

cash.  Thrify employees Barbara Bass, Joan Wunk, Jennifer Del Guidice, Jennifer Oberding, Rahla Rosenman, Claudia Garcia and Gideon Bari witnessed the robbery and all but Ms. Oberding provided accounts of it to the police.  These accounts indicated that the robbery was conducted by two African-American males in their mid-thirties, one wearing a copper-colored jacket, and one wearing a black jacket.  In Ms. Bass' original account, the robber who wore the black jacket was clean shaven.  (Bass Supp. Dep. at 1).  Ms. Garcia disagreed, reporting that he had a mustache.  (Garcia Supp. Dep. at 1).  Ms. Del Guidice reported that the black jacketed-robber had a "scuffy grey & black beard."  (Del Guidice Supp. Dep. at 1).  Of the eye-witnesses, Ms. Del Guidice provided the police with the most contemporaneous description of the robbery: hand-written notes that she had jotted down shortly after the robbery occurred.  The police, however, lost these notes.

Eleven days later, on January 25, 1999, Ms. Oberding and Ms. Del Guidice visited a gas station.  Ms. Oberding waited in the car, and Ms. Del Guidice went into pay.  While waiting to pay, Ms. Del Guidice heard a voice that she identified as belonging to one of the robbers.  She turned to see the speaker and, upon seeing Mr. Nelson, identified him as the black-jacketed robber.  Ms. Del Guidice went back outside and told Ms. Oberding what happened.  Ms. Oberding then wrote down Mr. Nelson's license plate, and provided this information to the police.

On January 26, 1999, the police asked Mr. Nelson to come to the station. The police snapped a photo of Mr. Nelson, but permitted him to leave without questioning him about the robbery.

On January 27, 1999, Ms. Wunk and Ms. Del Guidice went to the station to view a book containing approximately 200 photographs. Both identified a photo of Mr. Nelson. On January 29, 1999, the police showed Ms. Bass and Ms. Oberding an array of six photographs. Again, both identified a photo of Mr. Nelson.

On February 17, 1999, the police arrested Mr. Nelson. On April 13, 1999, Mr. Nelson took part in a lineup. Ms. Del Guidice, Ms. Oberding, Ms. Bass and Ms. Wunk identified Mr. Nelson in this lineup. Ms. Rosenman and Mr. Bari did not. On May 5, 1999, Mr. Nelson, through his attorney Martin Stilberg, sought to suppress the lineup identification on the grounds that the lineup was unduly suggestive. The lineup consisted entirely of African-American men. But the lineup's official photograph strongly suggests that Mr. Nelson was substantially lighter skinned than all of the "fillers" standing next to him. In addition, Mr. Nelson was substantially taller than all but one man in the lineup. The Court denied this motion, crediting Detective Raymond Kurtz's testimony that the photograph did not accurately depict how similar in skin color Mr. Nelson was to the fillers. In so doing, the Court did not credit Mr. Stilberg's account that the photograph accurately captured the skin color discrepancy between Mr. Nelson and the fillers.

3

A jury trial took place in July 1999. Shortly before the trial commenced, the prosecution informed the Court that it had lost Ms. Del Guidice's original handwritten notes, and thus had failed to turn these over to the defense. The Court then inquired into Mr. Stilberg's position concerning the lost notes, and Mr. Stilberg responded "[The Prosecution] made me aware. I don't know what else I can say." (Trial Tr. at 9). The Court then asked if Mr. Stilberg had any "other applications at this time?," and Mr. Stilberg reported "No, sir." (Trial Tr. at 9). In so doing, Mr. Stilberg failed to seek a remedy for the missing notes.

Mr. Stilberg gave the defense opening statement on July 22, 1999. During his opening, Mr. Stilberg instructed the jury to "Convict him, convict him, if I do not prove that [Mr. Nelson] was clean shaven on the day of the robbery . . . . beyond any doubt, not a reasonable doubt, not a shadow of a doubt, but any doubt." (Trial Tr. at 103).

During its case-in-chief, the prosecution presented no physical evidence linking Mr. Nelson to the crime. Rather, the prosecution's case depended entirely on eye-witness testimony. Ms. Wunk, Ms. Oberding, Ms. Bass and Ms. Del Guidice all took the stand and identified Mr. Nelson as one of the robbers. Ms. Wunk testified that, during the robbery, Mr. Nelson wore a "scruffy beard." (Trial Tr. at 122). Next, identifying Mr. Nelson, Ms. Bass testified that her original depiction of the robber as clean-

shaven was incorrect, and that she actually remembered the robber having about five days of facial hair "growth." (Trial Tr. at 210-12). Ms. Del Guidice also testified about the robber having a scruffy beard, which Ms. Del Guidice remembered as being black and grey.[1] (Trial Tr. at 282).

The defense responded to the prosecution's case by putting forward two witnesses, attorney Claude Timms and Nassau County Department of Probation employee Diane Eich, who testified that they saw Nelson on January 13, 1999 (the day before the robbery), and that he was clean-shaven at the time. (Trial Tr. 302, 330). In addition, Mr. Nelson's employer, Peter Lechter, further testified that, in the five years he knew Mr. Nelson (dating to 1994), Mr. Nelson never had a mustache or a beard. (Trial Tr. at 394). To "rebut" this testimony, the prosecution introduced, among other things, a 1993 arrest photo of Mr. Nelson wearing an orange prison uniform, which depicted Mr. Nelson with a moustache and beard. Along with one of Mr. Nelson's co-workers, Mr. Lechter also testified that Mr. Nelson was at work the day of the robbery, limiting (although not eliminating) his opportunity to commit the crime.

On July 29, 1999, the jury found Mr. Nelson guilty.[2] On

---

[1] Prior to sentencing, Mr. Nelson grew a full beard. It was all black, with no grey in it. (Sentencing Tr. at 8).

[2] The trial contained numerous irregularities, including a police detective improperly testifying about how "complainants"

5

or around September 28, 1999, one of Mr. Nelson's former jurors, Toni Jones, visited him in prison, out of a concern that Mr. Nelson's attorney was not competent enough to defend him. (Jones Stmt. at 2). In a subsequent conversation with a private investigator hired by Mr. Nelson, Ms. Jones reported that "two men" on the jury speculated it was "more than likely" that Mr. Nelson had a criminal record, based on the "mug shots" introduced at trial. (Jones Stmt. at 5-6). Notwithstanding this statement, on December 14, 1999, the Court sentenced Mr. Nelson as a prior felony offender to twenty years imprisonment.[3]

Mr. Nelson appealed his conviction. The New York Supreme Court, Second Appellate Department, unanimously affirmed it on February 10, 2003, and the New York Court of Appeals denied leave to appeal on June 26, 2003. Mr. Nelson also filed several unsuccessful post-trial motions in the New York County Court, County of Nassau, seeking to vacate his conviction under C.P.L. § 440.10. On January 11, 2006, Mr. Nelson commenced this Petition.

---

had "viewed some books" about Mr. Nelson. (Trial Tr. 441). The Court concluded that the prosecution had come "dangerously close" to a mistrial, but did not cross that line. (Trial Tr. 442).

[3] In prison, Mr. Nelson met a man named Randy Quill. Mr. Quill told Mr. Nelson that a man named "Andy" had confessed to him that he had robbed Thrify. On February 7, 2000, Mr. Quill provided a formal statement to Detective Kurtz. Mr. Quill reported that "Andy" was Andy Fraizer and that Mr. Fraizer "not only looks like [Mr. Nelson], he also sounds like [Mr. Nelson] and has a salt and pepper beard." (Quill Stmt. at 1). The police never turned this statement over to Mr. Nelson, forming the basis for one of Mr. Nelson's grounds for habeas relief.

6

Mr. Nelson's original Petition asserted five grounds for relief, including ineffective assistance of counsel and violation of his Fifth and Fourteenth Amendment rights to due process and a fair trial. Mr. Nelson has since moved to amend his petition to include an additional ineffective assistance of counsel claim, and a claim concerning the State's failure to preserve a 911 call of the robbery.

## DISCUSSION

### I. Federal Habeas Review of State Convictions

Mr. Nelson filed this action after the April 24, 1996, effective date of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Accordingly, AEDPA's provisions apply to his case. Williams v. Taylor, 529 U.S. 362, 402, 120 S. Ct. 1479, 1518, 146 L. Ed. 2d 389 (2000). Under the provisions of 28 U.S.C. § 2254(d), a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This deferential review is applied as long as the "federal claim has been 'adjudicated on the merits' by the state court." Cotto v. Herbert, 331 F.3d 217, 231 (2d Cir. 2003). "A state court

adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (internal citations and quotations omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (internal citations and quotations omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent." Penry v. Johnson, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001) (internal quotations and citations omitted). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Penry, 532 U.S. at 792. Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be

8

unreasonable." Williams, 529 U.S. at 411.

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). As a result, Mr. Nelson bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." Id. This is "particularly important when reviewing the trial court's assessment of witness credibility." Cotto, 331 F.3d at 233 (internal citations and quotations omitted).

II. Ineffective Assistance of Trial Counsel

A. Standard of Review

A claim of ineffective assistance of counsel is analyzed under the two-part test set forth in Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under Strickland, a petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) "affirmatively prove prejudice arising from counsel's allegedly deficient representation." Id.; see also Brown v. Greene, 577 F.3d 107, 110 (2d Cir. 2009).

In evaluating whether an attorney's representation has fallen "below an objective standard of reasonableness," Strickland, 466 U.S. at 688, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "Counsel has a duty to make reasonable investigations or make a reasonable decision that makes

particular investigations unnecessary." Id. at 691. In evaluating the reasonableness of counsel's decisions, however, "a heavy measure of deference [is accorded] to counsel's judgments." Id.

The second prong of the Strickland test requires that any deficiencies in counsel's performance be prejudicial to the defense. See Strickland, 466 U.S. at 692. While a finding of prejudice is not dependent upon a showing "that counsel's deficient conduct more likely than not altered the outcome in the case," id. at 693, the petitioner nevertheless must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

B.  Failure to Request a Remedy for the Missing Notes

It is undisputed that the Prosecution lost Jennifer Del Guidice's handwritten notes,[4] drafted shortly after the robbery, and never turned them over to the defense, in violation of People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (N.Y. 1961). It is also undisputed that Mr. Nelson's trial counsel, Mr. Stilberg, failed to request a remedy for these missing notes. (Trial Tr. at 9).

Mr. Nelson contends that Mr. Stilberg's failure to seek such a remedy fell below any objective standard of reasonableness

---

[4] At one point in the transcript, the Prosecution misidentified the notes as belonging to Jennifer Oberding, not Jennifer Del Guidice. The trial transcript makes it clear that the lost notes were Ms. Del Guidice's, not Ms. Oberding's (Trial Tr. 184; 283).
...

for effective counsel, and that this failure prejudiced his defense. Respondent replies that Mr. Stilberg's failure to seek a remedy was not ineffective assistance of counsel because no remedy was available. Respondent argues that, under New York law, a remedy was available for the lost notes only if Mr. Nelson suffered prejudice. Here, Respondent proffers, Mr. Nelson suffered no prejudice because the notes "had been incorporated into a statement prepared by the police, and that statement was provided to the defense counsel who had the opportunity to cross-examine the witness." (Resp. Br. at 9). But Respondent is wrong.

Under New York law, "[a] defendant is by definition prejudiced when identification is an issue in the case" and original, contemporaneous descriptions of a suspect are not turned over to the defense. People v. White, 232 A.D.2d 436, 436-437, 649 N.Y.S.2d 156, 157 (2d Dep't 1996); People v. Wallace, 76 N.Y.2d 953, 955 (N.Y. 1990) (defendant prejudiced because missing "written descriptions would have been helpful to defendant in cross-examining the officers, given the importance of the identification issue in the case"). The fact that Ms. Del Guidice's notes were supposedly incorporated into her supporting deposition "did not alleviate that prejudice" because "[t]here is no way to know whether the description contained in the [supporting deposition] matched those contained in the lost notes." Wallace, 76 N.Y.2d at 955. Thus, had Mr. Stilberg sought relief for the missing notes,

11

Mr. Nelson would have been entitled – as a clear matter of law – to some kind of remedy, such as an adverse inference that Ms. Del Guidice's original handwritten description of the robbers was not consistent with her trial testimony.

In failing to seek relief for Mr. Nelson regarding the missing notes, Mr. Stilberg's conduct fell below an objective standard of reasonableness. Indeed, the Second Circuit has repeatedly held that an attorney's waiver of a valid <u>Rosario</u> claim is "objectively unreasonable." <u>Flores v. Demskie</u>, 215 F.3d 293, 304 (2d Cir. 2000); <u>Mayo v. Henderson</u>, 13 F.3d 528, 534 (2d Cir. 1994) (counsel unreasonable for failing to raise a "particularly strong" <u>Rosario</u> claim). This is because, under New York law, obtaining some kind of relief for a <u>Rosario</u> violation is automatic. <u>Id.</u> Thus, the "only basis" for waiving a defendant's rights under <u>Rosario</u> is a "counsel's misunderstanding" of those rights. <u>Flores</u>, 215 F.3d at 304.

Furthermore, Mr. Stilberg's "objectively unreasonable" conduct prejudiced Mr. Nelson. In this regard, the Court should clarify that it is not sufficient for Mr. Nelson to establish prejudice under New York law (as <u>Rosario</u> violations are <u>per se</u> prejudicial). <u>Flores</u>, 215 F.3d at 305. Instead, Mr. Nelson must show that there was a "reasonable probability that the outcome would have been different." <u>Id.</u> In this case, that means that Mr. Nelson must show that – had Mr. Stilberg properly sought a remedy

for the missing notes – there was a "reasonable probability" that he would not have been convicted.

Mr. Nelson has done so. The prosecution's case against Mr. Nelson was remarkably weak, relying entirely on eye-witness testimony. See Williams v. Mazzuca, 570 F.3d 490, 506-07 (2d Cir. 2009) (case based entirely on eye-witness testimony, with no physical evidence or inculpatory statements, is "weak"). One of these eye-witnesses, Ms. Bass, was effectively impeached by her prior contradictory statements, because her original description of the black-jacketed robber as clean shaven did not match her trial testimony of the robber carrying a five day "growth." (Compare Bass Supp. Dep. to Trial Tr. at 210-12). The second witness, Ms. Wunk, testified at trial that the black-jacketed robber had "a couple weeks" of facial hair – but included no such description in her original supporting deposition, which merely mentioned the robber's ethnicity, height, and general build. (Compare Wunk Supp. Dep. to Trial Tr. at 122). The third witness, Ms. Oberding, provided no contemporaneous account of the robbery at all. Only Ms. Del Guidice provided a consistent account of the black jacketed robber's appearance, from her supporting deposition through to trial. And it was precisely this unique consistent account that an adverse inference instruction would have challenged.

Furthermore, notwithstanding Mr. Stilberg's errors, Mr. Nelson still put forward a strong defense. To challenge Ms. Bass',

13

Ms. Wulk's, and Ms. Del Guidice's testimony that the black-jacketed robber had a beard, Mr. Nelson put forward three witnesses who testified that he was clean shaven either on the day of the robbery, or the day before. And none of these witnesses had any obvious motive to lie. One, Claude Timms, was Mr. Nelson's attorney on an unrelated matter. (Trial Tr. 302). Another, Diane Eich, was a Nassau County Probation Officer.[5] (Trial Tr. 330). And the third was Mr. Nelson's employer, Peter Lechter, who also testified that Mr. Nelson was at work the day of the robbery, reducing Mr. Nelson's window of opportunity to commit the crime.

In short: (1) the prosecution had a weak case; (2) even an adverse inference (the weakest <u>Rosario</u> remedy available) would have made this case weaker by challenging the only consistent, detailed physical description of the black-jacketed robber; and (3) Mr. Nelson presented a strong defense. Under these circumstances, the Court finds that there was a reasonable probably that, but for Mr. Stilberg's error in failing to request a <u>Rosario</u> remedy, Mr. Nelson would not have been convicted. <u>See</u>, <u>Flores</u>, 215 F.3d at 305; <u>Mayo</u>, 13 F.3d at 536; <u>see</u> <u>also</u> People v. Clarke, 66 A.D. 693, 885 N.Y.S.2d 629, 630 (2d Dep't 2009) (reversing conviction based upon "reasonable possibility" that <u>Rosario</u> violation and subsequent failure to grant adverse inference "materially contributed" to

---

[5] Ms. Eich's testimony clarified that, although she happened to be a Probation Officer, Mr. Nelson was not on probation when she met him. (Trial Tr. 329).

trial's outcome).

Accordingly, the Court GRANTS Mr. Nelson's § 2254 petition on this ground.[6]

III. <u>Admission of 1993 Arrest Photo</u>

Over objection, the Court admitted a 1993 arrest photograph of Mr. Nelson, depicting Mr. Nelson in a prison-issue orange jumpsuit, beside a yardstick measuring his height. The Court admitted this photograph to rebut Mr. Lechter's testimony that Mr. Nelson did not have facial hair during the entire time he knew him. (Trial Tr. 452). When informed by Mr. Stilberg that Mr. Lechter's relationship with Mr. Nelson only began in 1994,[7] while this photograph was taken in June 1993, the Court responded "Close

---

[6] Mr. Nelson alleges that Mr. Stilberg was ineffective in several other ways, including "botching" Mr. Nelson's alibi, failing to request a jury instruction on the limited utility of voice identifications, failing to have Mr. Nelson grow a beard during trial, and instructing the jury to convict Mr. Nelson unless he proved "beyond any doubt" that Mr. Nelson was clean shaven at the time of the robbery. Mr. Nelson has since moved to amend his petition to include a claim that Mr. Stilberg failed to challenge supposedly inconsistent police reports. The Court GRANTS that motion to amend. However, because the Court has already found Mr. Stilberg to be constitutionally ineffective, and also finds that Mr. Nelson would independently be entitled to § 2254 relief for the improper admission of the 1993 arrest photograph, the Court does not reach Mr. Nelson's remaining claims concerning Mr. Stilberg's conduct.

[7] Mr. Stilberg represented that Mr. Lechter testified that he first met Mr. Nelson in "December 1994." (Trial Tr. 452) This is not accurate. In reality, Mr. Lechter testified in July 1999 that he had known Mr. Nelson for "approximately five years," placing their first meeting sometime around July 1994 – still more than a year after the photograph was taken. (Trial Tr. 342).

15

enough. I'm permitting it." (Trial Tr. 452). In so doing, the trial court overruled Mr. Stilberg's objection that the photograph was both irrelevant and deeply prejudicial to Mr. Nelson.[8]

Mr. Nelson faces a high burden in challenging the Court's admission of this evidence. It is not sufficient for Mr. Nelson to show that the Court erred, as a matter of state law, in admitting the photograph. Instead, he must show that the 1993 arrest photograph's admission deprived him of his federal constitutional right to "a fundamentally fair trial." Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004). Moreover, Mr. Nelson must show that the trial court's admission of the photograph "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Mr. Nelson has met that burden.

It is "constitutional error" to admit evidence that is "totally without relevance" to a criminal proceeding. Dawson v.

---

[8] Respondent does not dispute that Mr. Nelson exhausted this claim. The Court agrees, barely. His initial C.P.L. § 440.10 motion, filed pro se, argued that the trial court's admission of this photograph denied him a fair trial by violating his rights "under the constitution of this State and of the United States." Compare Duncan v. Henry, 513 U.S. 364, 364-366, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (petitioner failed to exhaust claims challenging admission of evidence because his state court petitions relied only upon his rights under California law, not the U.S. Constitution) with Keller v. Larkins, 89 F. Supp. 2d 593, 598 (E.D. Pa. 2000) (petitioner exhausted his evidentiary claims because, although he never explicitly cited the "federal due process clause" in state court proceedings, his state court objections were "consistently premised on the notion that a fair trial was impossible if such evidence were admitted").

Delaware, 503 U.S. 159, 165, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) (reversing death sentence because court errantly admitted stipulation that defendant was part of the Aryan Brotherhood, a "white racist prison gang," despite no evidence tying the Aryan Brotherhood to the murder of defendant's victim). Moreover, if "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Payne v. Tennessee, 501 U.S. 808, 825, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991); see also Snowden v. Singletary, 135 F.3d 732, 739 (11th Cir. 1998) (introduction of expert opinion that 99.5% of children tell the truth about sexual abuse was "federal constitutional error," because it invaded the jury's role in assessing witness credibility). The trial court's admission of the 1993 arrest photograph fails on both counts.

First, it was "totally without relevance" to the purpose for which it was introduced: impeaching Mr. Lechter's testimony that Mr. Nelson did not have a beard during the entire time Mr. Lechter knew him. Dawson, 503 U.S. at 165. Testifying in July 1999, Mr. Lechter reported that he had known Mr. Nelson for "approximately five years" (Trial Tr. 342), thereby indicating that he first met Mr. Nelson sometime around July 1994. The arrest photograph dated to June 1993, thirteen months earlier. The fact that Mr. Nelson may have had a beard in June 1993 does not, in any

17

way, impeach Mr. Lechter's testimony that Mr. Nelson had no beard between July 1994 and July 1999 – any more than the fact that George Bush was President in October 2008 could be used to "impeach" evidence that Barack Obama is President in November 2009. Contrary to the trial court's assessment, a period of thirteen months is not "close enough." (Trial Tr. 452). Indeed, had the photograph been taken a single day before Mr. Lechter met Mr. Nelson, it still would not have been "close enough," as it would have been equally irrelevant to assessing the reliability of Mr. Lechter's testimony. And, although not admitted for this purpose, whether Mr. Nelson had a beard in June 1993 is likewise irrelevant to the question of whether he had one in January 1999, when the robbery took place.

Second, the evidence strongly suggests that the 1993 arrest photograph was "unduly prejudicial." Payne, 501 U.S. at 825. One of Mr. Nelson's jurors, Toni Jones, has represented that "two men" on the jury speculated during deliberations that it was "more than likely" that Mr. Nelson had a criminal record, because of the "mug shots" introduced at trial. (Jones Stmt. at 5-6). Indeed, Ms. Jones reported that one juror, in particular "blew [Mr. Nelson] off" and she does not believe he ever "gave [Mr. Nelson] a chance. He's guilty that's it . . . . he wasn't being fair about it." (Jones Stmt. at 6). Thus, this is not a case where the Court needs to speculate concerning how the jury may have interpreted the

1993 arrest photograph, despite the trial court's curative instruction. See, generally, U.S. v. Yousef, 327 F.3d 56, 157 (2d Cir. 2003). Indeed, if anything, the evidence is clear that the introduction of the 1993 arrest photograph tainted the jury process, as at least two jurors interpreted the "mug shots" as indicting the probability of Mr. Nelson having a prior criminal record, and expressed these sentiments to the entire jury during deliberations. In so doing, the trial court's erroneous admission of the 1993 arrest photograph unduly prejudiced Mr. Nelson. See Wilson, 570 F.3d at 507 (improper introduction of "mug shot" and prior bad acts prejudiced the defendant by implying that he had a "propensity for criminality and violence").

Accordingly, Mr. Nelson's habeas petition is also GRANTED on this ground.

IV. Mr. Nelson's Other Claims

Mr. Nelson has raised numerous other claims for relief. For the most part, these claims are not frivolous. Nevertheless, the Court has already granted Mr. Nelson's petition on two separate, independent grounds. Mr. Nelson can be afforded no further relief from consideration of his remaining arguments. Thus, the Court does not reach Mr. Nelson's remaining grounds at this time.

CONCLUSION

For the foregoing reasons, Mr. Nelson's petition for a

19

writ of habeas corpus (06-CV-0116), pursuant to 28 U.S.C. § 2254, is GRANTED. The December 14, 1999 judgment convicting him of Robbery in the First Degree and Robbery in the Second Degree, and imposing sentence, is VACATED. Respondent is ORDERED to either release Mr. Nelson or provide him a new trial within thirty (30) days of this Order.

                                      SO ORDERED

                                      /s/ JOANNA SEYBERT
                                      Joanna Seybert, U.S.D.J.

Dated: Central Islip, New York
       November  25 , 2009